**ELJER MANUFACTURING, INC., a Delaware corporation, and Successor in Interest to Household Manufacturing, Inc., Plaintiff,**

**The Travelers Indemnity Company of Illinois, and Highlands Insurance Company, Intervening Plaintiffs,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts corporation, Defendant.**

No. 88 C 3143.

United States District Court, N.D. Illinois, E.D.

June 14, 1991.

On Reconsideration Aug. 23, 1991.

David E. Bennett, Ernest Summers, III, Vedder Price Kaufman & Kammholz, Chicago, Ill., for plaintiff.

Samuel A. Purves, Kathleen Harvey Jensen, McKenna, Storer, Rowe, White & Farrug, Michael J. Sehr, Haskell & Perrin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

This case is a declaratory judgment action concerning the issue of which of a series of insurance policies provides coverage for various claims against Eljer Manu-

facturing, Inc., the plaintiff in this action.[1] Presently pending are cross motions for summary judgment.[2] All parties agree that this case can be resolved on summary judgment by interpreting the language of the insurance policies, any remaining factual disputes being nonmaterial.

The parties have entered into a lengthy stipulation of facts. Many of those facts, however, are immaterial to the resolution of this case which requires only a general declaration as to the meaning of the insurance policies, not a specific determination as to which policy provides coverage for any particular claim. The basic facts are as follows.

This action was brought by Eljer in April 1988. Named as defendant was Liberty Mutual Insurance Company ("Liberty"), a Massachusetts corporation with its principal place of business in Massachusetts. Liberty issued a series of one-year insurance policies to Eljer that ran from January 1, 1979 to January 1, 1989. The four policies that covered calendar years 1979 through 1982 were issued in New York. The six policies that covered calendar years 1982 through 1988 were issued in Illinois. Five supplemental policies covering Texas operations and calendar years 1980 through 1985 were also issued. The first three were issued in New York and the latter two in Illinois. United States Brass Corporation ("U.S. Brass") is a subsidiary of Eljer and is a named insured under all of the policies. In October 1988, Highlands Insurance Company ("Highlands"), a Texas corporation with its principal place of business in Texas, was permitted to intervene as a party plaintiff. In November 1988, Travelers Indemnity Company of Illinois ("Travelers"), an Illinois corporation with its principal place of business in Illinois, was permitted to intervene as a party plain-tiff. Highlands provided Eljer with first level excess coverage for the years 1979 through 1981. Travelers provided Eljer with first level excess coverage for the years 1982 through 1986.

The parties agree that, despite a slight modification of policy language over the years, the same ruling should apply to all the policies. From 1979 through 1985, the policies contained the following language:

The Company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

Coverage A. **bodily injury** or

Coverage B. **property damage** to which this policy applies, caused by an **occurrence,** . . . .

\* \* \* \* \* \*

"**property damage**" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

\* \* \* \* \* \*

"occurrence" means, (a) an accident, including continuous or repeated exposure to conditions, which results in "bodily injury" or "property damage" neither expected nor intended from the standpoint of the "insured". . . .

From 1986 through 1988, the policies contained the following language:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this policy applies. . . . This insurance applies only to "bodily injury" or "property damage"

---

**1.** The corporation was originally known as Wallace Murray Corporation. Sometime prior to 1988, it changed its name to Household Manufacturing, Inc., which was the name of the corporation at the time this suit was filed. Household was incorporated in Delaware with its principal place of business in Illinois at the time the suit was filed. In April 1989, Household changed its name to Eljer Manufacturing, Inc. and moved its principal place of business to Texas. Hereinafter, plaintiff will be referred to as "Eljer," regardless of the time period involved.

**2.** Intervenor Travelers' motion to supplement the record is denied. Newspaper articles containing purported admissions of a party are not admissible evidence.

which occurs during the policy period. The "bodily injury" or "property damage" must be caused by an "occurrence." The "occurrence" must take place in the "coverage territory." ...

\* \* \* \* \* \*

"Property damage" that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the "occurrence" that caused it.

\* \* \* \* \* \*

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \* \* \* \*

"Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property; or

b. Loss of use of tangible property that is not physically injured.

The primary policies for the years 1979 through 1986 limited property damage liability to $1,000,000 per occurrence and $2,000,000 aggregate. The 1987 and 1988 primary policies had general aggregate limits of $6,000,000.

From 1979 through 1986, U.S. Brass manufactured and sold the components comprising the Qest Qick/Sert II residential polybutylene system ("Qest System"), a plastic hot/cold pressure plumbing system for installation in site-built residential dwellings, including houses, apartment buildings, and condominiums. The Qest System still is used in mobile homes, but has not been warranted to be installed in site-built housing since December 31, 1986. U.S. Brass sold the Qest System to plumbing contractors who installed the systems at construction sites. U.S. Brass also provided special crimping tools used in installing the system, as well as special instructions for installing it. The Qest System was almost always installed behind walls and between floors and ceilings. Repair or replacement generally requires breaking through walls, floors, or ceilings. Approximately 500,000 to 750,000 housing units in the United States contain the Qest System and, as of September 1990, approximately 5% had reported failures of the system.

Lawsuits based on failures of the Qest System have been filed against Eljer in at least 20 different states. Claims in these lawsuits are predicated on theories of strict liability in tort, breach of warranty, negligence, gross negligence, misrepresentation and fraud, and various state deceptive trade practices statutes. Plaintiffs allege that the Qest System is defective because subject to leaking. Plaintiffs seek to recover for damage to the housing structure, fixtures, or personal property caused by leaks, the cost of replacing the Qest System, relocations costs, diminution in the value of the residence, and/or mental anguish. In some cases, plaintiffs have filed suit prior to the occurrence of any leaks, seeking damages for the decreased value of the residence and/or the costs of repairing or replacing the plumbing system. The following causes of leaks have been alleged: inadequate installation instructions; using materials that degrade when exposed to chlorinated water used in residences; unsuitability of the system when hot water recirculates within it; improper design in using a crimp ring to join the fitting to a pipe; failure to test the system before offering it for sale; improper design of the Celcon fittings that are part of the system; defectively designed and manufactured crimping tools; impossibility of proper installation; improper design and manufacture of the crimp rings; and errors in manufacturing the component parts.

The dispute in the present case concerns coverage for the claims brought by homeowners or contractors based on failures of the Qest System. As of September 1990, approximately 200 lawsuits involving 16,700 housing units had been filed. Both Liberty and the excess carriers have been defending suits. Some of the cases have gone to trial and some have been settled. The present suit centers on the question of which policy period the individual claims should be assigned to. In 1988, Liberty informed Eljer that it had reached the limits of any applicable policy. Liberty, how-

ever, continued to defend the suits and all four parties entered into an interim reimbursement agreement pending the outcome of this suit. The parties also reached a tentative settlement that Eljer and Liberty signed, but the settlement was not consummated because Travelers and Highlands never signed it. A case or controversy presently exists because Liberty denies that there is further coverage and the excess carriers deny coverage for certain years.

In a prior lawsuit between Eljer and Liberty, this court ruled that all the claims should be considered a single occurrence.[3] *See Household Manufacturing, Inc. v. Liberty Mutual Insurance Co.*, No. 85 C 8519, 1987 WL 6611 (N.D.Ill. Feb. 10, 1987), *reconsideration granted*, 1987 WL 20137 (Nov. 16, 1987). The parties agree that that ruling has no direct bearing on the present dispute. Although one occurrence, the parties agree that property damage can occur in different years and that Eljer is not limited to claiming $1,000,000 for a single occurrence, but can claim the full limit for each separate policy period in which property damage occurred. Eljer argues that property damage occurs when the Qest System was installed in a particular housing unit. Liberty argues that property damage occurs when leaks first occur or, in the non-leak claims, when the owner first becomes aware that the value of the residence has declined or that the plumbing system needs to be replaced. Travelers argues that the property damage occurs on the date of the first leak.[4]

If Eljer's theory is accepted, all claims will have occurred from 1979 to 1986, the last year in which the Qest System was installed in residences other than mobile homes. If Liberty's or Travelers' theory is accepted, then Eljer may be afforded less coverage. Using the appearance of leaks and awareness of problems as the trigger date pushes many claims beyond the year of installation of the system. Thus, under the insurers' theories, claims in the early years of sales may be less than the limit of Liberty's policies. Of more concern to Eljer, however, is that under the insurers' theories, much of the property damage would not be considered to have occurred until after installation ceased in 1986. Eljer's excess coverage ended in 1986 and it has no coverage whatsoever after January 1, 1989.

■ Before turning to the merits of this case, a jurisdictional question must be considered. In August 1988, while Eljer was still a citizen of Illinois, Highlands and Travelers moved to intervene. Both intervenors represented that they were plaintiff-intervenors and their complaints only named Liberty as a defendant, not Eljer as well. It was assumed that the intervenors designated themselves as plaintiffs because they wanted Liberty to pay a greater amount of the claim before they were obliged to cover the excess. However, it is now clear that Travelers'[5] interest is and was consistent with Liberty's interest. Both want the claims to be pushed to a later period in time beyond the dates covered by the policies they have issued to Eljer. Thus, both argue similar theories for determining the date of the occurrence and both are aligned against Eljer on the motions for summary judgment. Travelers should have been designated as an intervening defendant, not an intervening plaintiff. At the time of intervention, however, both intervening defendant Travelers and plaintiff Eljer were citizens of Illinois.

The rule has been that permissive intervention pursuant to Fed.R.Civ.P. 24(b) requires an independent basis of jurisdiction,

---

3. In the prior suit, the dispute centered on a form of self-insured retention that Eljer had. The computation of that retention differed if all claims were one occurrence instead of multiple occurrences under the policies.

4. Highlands has not moved for summary judgment. Its claims, however, cannot be separated from those of the other parties. The declaratory judgment that is granted as a result of the summary judgment motions will resolve all the issues in this case. Therefore, Highlands has implicitly agreed to rely on the briefs filed by the other parties.

5. Whether Highlands is a plaintiff or defendant is not of concern because, as of the time it intervened, its citizenship was diverse from all three of the other parties.

whereas intervention of right pursuant to Rule 24(a) does not unless the intervenor is also an indispensable party under Rule 19(b). *American National Bank & Trust Co. of Chicago v. Bailey,* 750 F.2d 577, 583 (7th Cir.1984), *cert. denied,* 471 U.S. 1100, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985); C.A. Wright, A. Miller, M.K. Kane, *Federal Practice & Procedure* § 1917 (2d ed. 1986). The continued vitality of the rule that intervention as of right does not require an independent jurisdictional basis, however, is brought into question in light of *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), which narrowed the scope of ancillary jurisdiction over additional parties. *Compare City of Worcester v. HCA Management Co.,* 753 F.Supp. 31, 35–36 (D.Mass.1990) (reexamining jurisdiction over third-party claims in light of *Finley*). In *Finley,* the Court indicated that ancillary jurisdiction over an additional party would be proper in some situations, including "when an additional party has a claim upon contested assets within the court's exclusive control or when necessary to give effect to the court's judgment." 490 U.S. at 551, 109 S.Ct. at 2008.

If timely application is made, Rule 24(a)(2) provides for intervention as of right "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Thus, four elements must be satisfied: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action, and (4) lack of adequate representation of the interest by the existing parties to the action." *Meridian Homes Corp. v. Nicholas W. Prassas & Co.,* 683 F.2d 201, 203 (7th Cir.1982).

The timeliness requirement is satisfied. Given the "following form" nature of the excess coverage, it is also clear that Travelers has an interest in the litigation that satisfies the second element. *National Union Fire Insurance Co. of Pittsburgh v. Continental Illinois Corporation,* 110 F.R.D. 608, 609 (N.D.Ill.1986). As for the third element, any adverse decision in the litigation between Eljer and Liberty would not be binding on Travelers in that neither party would be able to use collateral estoppel or *res judicata* against Travelers, though Travelers would likely be able to use it against them if the decision were favorable to Travelers. *See id.* at 610–11. Impairment of rights, however, can occur in that a decision adverse to the potential intervenor would have a *stare decisis* effect if appealed. *Meridian,* 683 F.2d at 204; *Atlantis Development Corp. v. United States,* 379 F.2d 818, 828–29 (5th Cir. 1967). Since the original parties are raising the same issues that Travelers is interested in, Travelers' interests could be impaired by an adverse decision.[6] The third element is satisfied.

The fourth element, however, is not satisfied. "Although the burden of proof on the party seeking to show lack of adequate representation is minimal, where it is established that the parties have the same ultimate objective in the underlying action, the intervenors must demonstrate, at the very least, that some conflict exists." *Meridian,* 683 F.2d at 205. Travelers contended that its interests would not be adequately represented by Liberty or Highlands. Liberty and Highlands, like Travelers, have an interest in pushing the date of property damage to a later time so that they could possibly avoid having to cover the claim. While it is true that each party has its own particular period of time that it is interested in, this does not necessarily result in adverse interests. Highlands would be interested in pushing all the property damage dates to a time after 1981, which would not be in Travelers' interest unless a great-

**6.** In *National Union,* the original parties were contesting issues related to the potential intervenors' interests, but issues that would not themselves be involved in any dispute the poten-tial intervenors might have had with the original parties. *See National Union,* 110 F.R.D. at 611. Thus, *National Union* is distinguishable on this issue.

er amount of claims were also pushed beyond 1986. Liberty, however, has an interest in pushing the occurrence dates not only beyond 1986, but beyond 1988 as well. That Liberty may also have other interests peculiar to being the primary carrier does not change the fact that Liberty and Travelers have no conflict on the date of property damage issue. *Cf. Meridian*, 683 F.2d at 205 (that original party and potential intervenor had a conflict as to splitting profits between each other did not constitute a conflict preventing adequate representation where those parties had no conflict as to the legal issue in dispute with their common opponent). The lack of any conflict creating inadequate representation is also shown by the fact that Liberty and Travelers present essentially the same argument in support of their motions for summary judgment. Also, there does not appear to be any substantial conflict with Highlands, which did not even find it necessary to file any brief in addition to those of Liberty and Travelers.

Since Travelers does not satisfy the requirement for intervention as of right, it is unnecessary to determine if *Finley* changes the rule as to the necessity of an independent basis of jurisdiction. Even before *Finley*, such a requirement was applicable to permissive intervention. Travelers' motion to intervene was improvidently granted because it was only entitled to intervene permissively under Rule 24(b). It should have been characterized as a defendant-intervenor opposing plaintiff Eljer, and there was no independent basis of jurisdiction for such a claim in that Eljer (then incorporated as Household) and Travelers were both citizens of Illinois. Travelers' initial intervention complaint is dismissed for lack of subject matter jurisdiction.

■ The intervention question, however, does not end here. As of now, Eljer is not a citizen of Illinois. Therefore, there would be no jurisdictional problem with presently permitting Travelers to intervene as a de-

fendant. Permissive intervention would be appropriate in that there is a common question of law. *See* October 27, 1988 Order. The only remaining issue would be one of timeliness. Given its prior involvement in this suit, no delay would occur as a result of presently permitting Travelers to intervene. Therefore, Travelers is dismissed from this case, curing any jurisdictional problem based on lack of complete diversity, and will be granted leave to permissibly intervene as a defendant on its filing of a proper motion so to do within five days of the date of this order. In the meantime, Travelers' brief will still be considered, as an *amicus curiae* brief since it is not a party. The Clerk of the Court will also be directed to correct the docket to list Highlands as a defendant-intervenor.

The parties agree that New York law governs as to the policies covering calendar years 1979 through 1982 and that Illinois law governs as to all subsequent policies. The parties also agree that there is no substantive difference between Illinois law and New York law so that Illinois law, the law of the state in which this court sits, can be applied to all the policies. *See Shore v. Dandurand*, 875 F.2d 656, 659 (7th Cir. 1989).

■ The parties agree that the focus of this case is the meaning of the contract language. *See Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 693, 514 N.E.2d 150, 159 (1987); *American Home Products Corp. v. Liberty Mutual Insurance Co.*, 748 F.2d 760, 764 (2d Cir.1984) (New York law); *Dow Chemical Co. v. Associated Indemnity Corp.*, 724 F.Supp. 474, 479–80 (E.D.Mich.1989). Both forms expressly provide that property damage, not the occurrence, must occur within the policy period.[7] Both forms, however, contain one exception to this provision. " 'Property damage' that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the 'occur-

---

7. This provision will be referred to as the "general rule," as distinguished from the "exception" set forth below.

rence' that caused it."[8] The claims against Eljer are of two general types: (1) those claims involving leaks and (2) those claims not involving leaks. The damages claimed in the first type of case can be divided into two categories: (a) damages caused to the structure or contents of the structure by the leaks and (b) the costs of replacing or repairing the system and any diminution in the value of the property distinct from the water damage caused by the leaks. In the second type of claim, that is the "non-leakers," only the second category of damages is claimed.

*United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 193 Ill.App.3d 1087, 140 Ill.Dec. 907, 550 N.E.2d 1032 (1st Dist.1989) (*"Wilkin I"*), aff'd, 144 Ill.3d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (Ill.1991) (*"Wilkin II"*), is most instructive. While not addressing the timing and trigger issues involved in this case, *see Wilkin I*, 140 Ill.Dec. at 913, 550 N.E.2d at 1038, the Illinois courts addressed the questions of what is meant by "property damage" and "occurrence" in insurance contracts containing the same language as involved in the present case. In *Wilkin I*, the court held that having asbestos-containing insulation in a building constituted property damage caused by an occurrence. *Id.* 140 Ill. Dec. at 913–14, 550 N.E.2d at 1038–39. The Appellate Court held that incorporation of asbestos in a property physically alters the structure itself and makes it harmful and therefore constitutes property damage under the policy. *Id.* 140 Ill.Dec. at 913, 550 N.E.2d at 1038. It was held that the physical alteration of adding a defective component to the building, not the resulting diminution in value, constitutes property damage. *See id.* 140 Ill.Dec. at 912–13, 550 N.E.2d at 1037–38. Alternatively, the Appellate Court held that, even absent physical injury, loss of use of the property constituted property damage under the second clause of the definition of property damage. *Id.* 140 Ill.Dec. at 913, 550 N.E.2d at 1038. Furthermore, the court held that, as long as the detrimental effects

of asbestos were not foreseen, incorporating the asbestos into the building would constitute an occurrence in that it would be "an accident including continuous or repeated exposure to conditions which result in property damage or bodily injury, neither expected nor intended from the standpoint of the insured." *Id.* 140 Ill.Dec. at 913–14, 550 N.E.2d at 1038–39.

The Illinois Supreme Court affirmed the Appellate Court, but the Supreme Court's reasoning differed from that of the Appellate Court. The Illinois Supreme Court made clear that the property damage was the contamination of other portions of the structure by the toxic asbestos fibers. *Wilkin II*, 161 Ill.Dec. at 285, 578 N.E.2d at 931. The Illinois Supreme Court also made clear that the release of asbestos fibers, not the installation of the insulation, was the accident that constituted an occurrence. *Id.* 161 Ill.Dec. at 286, 578 N.E.2d at 932.

> In the instant action, the underlying complaints all allege that the asbestos-containing products continuously release toxic asbestos fibers into the air. This continuous release of asbestos fibers constitutes a harmful condition. By virtue of the "continuous or repeated exposure to the condition" of asbestos fiber release, the buildings and their contents became contaminated. It is the continuous exposure of the buildings and their contents to released asbestos fibers which constitutes the "accident," as defined by the insurance policies. The "accident" results in "property damage." Therefore, the "property damage" alleged in the underlying complaints is caused by an "occurrence," as defined within the insurance policies.

*Id.*

Unlike the Appellate Court, the Illinois Supreme Court did not find that the installation itself was an occurrence. While it could be argued that the Illinois Supreme Court did not expressly decide that installation is not an occurrence, such a holding is implicit in *Wilkin II*. In holding that the

---

8. The earlier policies provide that property damage includes "loss of use of tangible property which has not been physically injured or de-stroyed provided such loss of use is caused by an occurrence during the policy period."

continuous release of fibers was an accident constituting an occurrence, the Illinois Supreme Court distinguished the intentional act of installing the asbestos-containing insulation from the unintended result of fibers being released. *See id.* 161 Ill.Dec. at 286, 578 N.E.2d at 932. The court further states: "Plaintiffs misread the definition of 'occurrence' contained in the policies. Under this definition, it is the 'property damage' which must be 'neither expected nor intended from the standpoint of the insured.' Therefore, it is the contamination of the buildings and their contents that must be neither expected nor intended by Wilkin. We have reviewed the underlying complaints and are unable to find any allegations that Wilkin 'expected or intended' to contaminate the buildings and the contents therein with toxic asbestos fibers." *Id.* 161 Ill.Dec. at 286, 578 N.E.2d at 932.

*Wilkin II*'s discussion of the exclusionary clauses of the policies involved in that case is also instructive. The policies contained a "sistership" exclusion excluding from coverage "[d]amages claimed for the withdrawal, inspection, repair, replacement or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein." [9] *See id.,* 161 Ill.Dec. at 287, 578 N.E.2d at 933. That exclusion did not prevent coverage because, in *Wilkin II:*

> the underlying complaints allege that the asbestos-containing product has already failed while in use, resulting in damage to the property of the building owners. The underlying complaints seek damages for the inspection of the buildings and the removal and replacement of this product, not as the cost of a preventative

action withdrawing sister products from the market, but as a measure of the property damage which has already been incurred by reason of this product. Therefore, we hold that the policies' "sistership" exclusions are inapplicable....

*Id.* 161 Ill.Dec. at 287–288, 578 N.E.2d at 933–934.

The policies also excluded "property damage to the insured's products arising out of such products or any part of such products" and "property damage to work performed by or on behalf of the insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith." [10] *See id.* 161 Ill.Dec. at 288, 578 N.E.2d at 934.

> Plaintiffs argue that these exclusions apply in the instant action, pointing to the fact that the underlying complaints seek recovery for the costs of the removal, repair and/or replacement of the asbestos-containing product. However, plaintiffs fail to recognize that the underlying complaints seek these damages as a result of the contamination visited upon the buildings and the contents therein by the product that Wilkin installed. As such, the underlying complaints seek recovery for damage to property other than the product installed by Wilkin or Wilkin's workmanship. Therefore, these exclusionary clauses are inapplicable to the case at bar.

*Id.*

*Wilkin I* indicates that incorporation of a defective product into a structure is itself property damage and thus would support Eljer's contention that property damage occurred at the time Qest Systems were installed.[11] That aspect of the Appellate Court's decision, however, cannot be considered good law in light of the reasoning set forth in *Wilkin II* for affirming the

---

**9.** In the present case, Exclusion (p) of the older policies is identical. Exclusion (n) of the newer policies is similar.

**10.** Exclusions (n) and (*o*) of the older policies are essentially identical. Exclusions (k) and (*l*) of the newer policies are similar.

**11.** Even accepting this theory, though, the water damage, in contrast with the repair costs, replacement costs, and diminution in value, would probably still not be considered to have occurred until there was actual water damage. *Cf. Greenlee v. Sherman,* 142 A.D.2d 472, 536 N.Y.S.2d 877, 880–81 (3d Dept.1989).

Appellate Court's decision. *Wilkin II* makes clear that property damage under the type of insurance contracts involved in the present case is the damage to other parts of the structure or the contents of the structure. Even the costs of repairing or replacing an insured's products that have been incorporated in the structure are only measures of monetary compensation; "property damage" as used in the policies is the asbestos contamination or, in the present case, the occurrence of water damage. Following *Wilkin II*, the repair and replacement costs related to the defective Qest Systems would be measures of compensation for the water damage, which is the actual property damage as that term is used in the insurance policies. Since, in *Wilkin II*, the repair and replacement costs could be associated with asbestos-contamination, it was unnecessary to determine if repair and replacement costs could be measures of other types of property damage as well.

■ Having identified water damage as an event that constitutes property damage under the insurance policies, the trigger for insurance coverage can more readily be identified. Under the general rule, it is the occurrence of property damage that must fall within the policy period. Water damage does not occur until pipes leak. Therefore, in the "leaker" cases, the applicable policy is the one in effect at the time the water leaks and causes damage to the structure or contents of the structure. As indicated by *Wilkin II*, related repair or replacement costs, and presumably diminution in value expenses as well, are measures of the amount of compensatory damages, but the water damage to the property is the actual property damage. Even if repairs were not done until a later period of time or the diminution in value was not recognized until later, the covered damages represented by those costs are considered to have occurred at the time of the actual leaks. Such a holding is consistent with the plain language of the policy which covers "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof *at any time* resulting therefrom."

This holding is consistent with New York law. *Greenlee v. Sherman*, 142 A.D.2d 472, 536 N.Y.S.2d 877, 880–81 (3d Dept. 1989), for example, makes clear that fire damage to a structure is distinct from damage to the defective product that caused the fire and that the fire damage occurs at the time the other property is physically injured by the fire, not when the defective product is physically injured. Water damage to a homeowner's walls, mattress, or other property is clearly physical injury to tangible property and thus clearly is property damage. Similar to fire damage to a structure or its contents occurring at the time the property burns, water damage to a structure or its contents occurs when the property becomes wet; it does not occur when the Qest System is first installed. As was pointed out in *Greenlee*, 536 N.Y.S.2d at 881, with regard to the defective furnace involved in that case and the ability to prevent a fire, if the defective plumbing system had been repaired before leaks occurred, no water damage would have ever occurred. Therefore, the water damage was not inevitable and, even if progressive deterioration occurred within the policy period, water damage could still have been prevented. Water damage cannot be considered to have occurred until property gets wet.

Eljer argues that property damage occurs from the moment the Qest System is installed because deterioration of the system begins the moment the system is installed and this constitutes physical injury to tangible property.[12] The problem with this argument is that the deterioration of the pipe is not itself covered property damage. While deterioration of the Qest System itself may very well constitute physical injury to tangible property that occurs within a policy period, such property dam-

---

**12.** On the record before the court, it cannot be determined what the actual cause of the Qest System failures were. For purposes of deciding the pending motions and issuing a declaratory judgment, however, it can be assumed that at least some of the claims for which Eljer seeks coverage involved progressive deterioration of the pipe that began the moment of installation.

age is excluded from coverage under various exclusions contained in the policies. Coverable property damage does not occur until the system deteriorates to the point that it causes damage to other parts of the structure or contents of the structure as is indicated by the discussion of exclusions contained in *Wilkin II*, 161 Ill.Dec. at 287–288, 578 N.E.2d at 933–934.[13]

Eljer relies on cases that it contends hold to the contrary. In *Ohio Casualty Insurance Co. v. Bazzi Construction Co.*, 815 F.2d 1146 (7th Cir.1987) (Illinois law), it was held that defective design or improper pouring of concrete for the second floor of a parking garage constituted property damage under a comprehensive general liability policy like those involved in the present case. In *Bazzi*, there was not merely damage to and defects in the insured's own work, but also damage to the structural integrity of the entire building. *See id.* at 1147–48. *Bazzi* was expressly distinguished from other cases that involved damage solely to the product or work of the insured. *See id.* at 1148. The present situation is distinguishable because, prior to any leaks, there is no damage to other parts of the structure and the structural integrity of the building is still sound. Once leaks occur, however, the structural integrity of the residential unit may very well be threatened or the building may be essentially uninhabitable because the water system cannot be used without causing further damage.

Eljer also relies on *W.E. O'Neil Construction Co. v. National Union Fire Insurance Co. of Pittsburgh*, 721 F.Supp. 984 (N.D.Ill.1989). That case involved defective steel mesh inside the concrete of a four-level parking garage that caused cracks in the floors and walls throughout the garage. It was held that the damage to the structure, but not the defective mesh, was property damage under an insurance policy containing the same language as is involved in the present case. Contrary to Eljer's reliance on *O'Neil*, this case does not support Eljer's position since it holds that defects in the insured's product do not constitute property damage. *O'Neil* states the general rule that "Where a defective product manufactured or installed by the insured has been integrated with someone else's property, it is clear that damage to that property as a whole, *excluding the cost of repairing or replacing the defective part,* constitutes property damage." *Id.* at 991 (emphasis added). *O'Neil* makes clear that the defect in the product itself is not property damage. *Id.* at 992 (quoting *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.*, 508 F.2d 417, 419–20 (7th Cir.1975) (applying Ohio law, but assuming Ohio law is consistent with Illinois law)).[14] Just as there were cracks in the parking garage in *O'Neil*, leaks in and water damage from a residential unit's Qest System would constitute damage to the overall structure.

Two Illinois Appellate Court cases predating the form contract language involved in the present case involved incorporation of defective parts in a larger product. *See Pittway Corp. v. American Motorists Insurance Co.*, 56 Ill.App.3d 338, 13 Ill.Dec. 244, 248, 370 N.E.2d 1271, 1275 (2d Dist. 1977); *Elco Industries, Inc. v. Liberty Mutual Insurance Co.*, 46 Ill.App.3d 936, 5 Ill.Dec. 266, 361 N.E.2d 589 (1st Dist.1977). As was stated in *Pittway*, 13 Ill.Dec. at 247, 370 N.E.2d at 1274, "we have found what we conclude to be a majority position which holds the term 'property damage' includes tangible property which has been diminished in value or made useless irrespective of any actual physical injury to the tangible property." Both cases, however,

---

13. Construction of the exclusions is not an issue directly presented to this court. The discussion of the exclusions in this case should not be considered a full delineation of which portions of repair and replacement costs are covered by the policies. A declaration as to the precise meaning of the exclusions is not requested and will not be provided.

14. It is noted that two Illinois Appellate Court cases have rejected the holding in *Hamilton Die. See Wilkin I,* 140 Ill.Dec. at 912–13, 550 N.E.2d at 1037–38; *Pittway Corp. v. American Motorists Insurance Co.,* 56 Ill.App.3d 338, 13 Ill.Dec. 244, 248, 370 N.E.2d 1271, 1275 (2d Dist.1977). *See also McDowell–Wellman Engineering Co. v. Hartford Accident & Indemnity Co.,* 711 F.2d 521, 525 n. 5 (3d Cir.1983).

involved a definition of property damage as being "injury to or destruction of tangible property." Thus, in those cases, "injury to ... tangible property" could constitute property damage, whereas the present case requires, under the general rule, *"physical injury to ... tangible property."* Nevertheless, a more recent Illinois case involving the same contract language as in the present case holds that *Elco* and *Pittway* are still controlling law. *See Marathon Plastics, Inc. v. International Insurance Co.*, 161 Ill.App.3d 452, 112 Ill.Dec. 816, 514 N.E.2d 479, 484–86 (4th Dist.1987), *leave to appeal denied*, 119 Ill.2d 559, 119 Ill.Dec. 387, 522 N.E.2d 1246 (1988). This court must defer to the Illinois Appellate Court on issues of Illinois law unless there is good reason to believe and persuasive data that the Illinois Supreme Court would reject the holdings of the appellate courts. *See First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1038 (7th Cir. 1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1123, 107 L.Ed.2d 1030 (1990); *Peeler v. Village of Kingston Mines*, 862 F.2d 135, 137 (7th Cir.1988); *Sommers v. 13300 Brandon Corp.*, 712 F.Supp. 702, 704 (N.D.Ill.1989).

■ To the extent *Elco* and *Pittway* hold that *physical* injury to tangible property is not necessary for there to be property damage, those two cases are distinguishable because they involve different contract language. This holding of these two cases, however, has been largely incorporated into the language of the policies involved in this case. The exception incorporates this holding, though it only covers loss of use without physical injury, not mere diminution in value without physical injury. *Marathon* indicates that diminution in value can itself be property damage and apparently relies on the general rule of the poli-

cies, not the exception.[15] 112 Ill.Dec. at 822, 514 N.E.2d at 485. Given the plain language of the policy that physical injury is required[16] and in light of *Wilkin II*'s discussion of the exclusions, there is persuasive evidence that repair costs, replacement costs, and diminution of value are not property damage under the general rule, nor even measures of property damage, absent *physical* injury to tangible property.

There is, however, another aspect of property damage that involves physical injury to tangible property and which is not inconsistent with the holding in *Wilkin II*. Liberty concedes that where repair or replacement of the insured's product requires damaging other parts of the structure in order to perform the replacement or repair, this damage to other parts of the structure constitutes property damage. *See Elco*, 5 Ill.Dec. at 268–69, 361 N.E.2d at 591–92. In the present case, the breaking of walls, floors, and ceilings that must be done in order to have access to repairing or replacing the Qest System constitutes property damage. As regards the leaker cases, this type of property damage does not occur until after the leaks have occurred. Thus, the date of coverage for the damage would not be any earlier than it is when measuring it by the date of leaks. In any event, under the policies, covered damages for the leaker cases is covered by the policy in effect at the time leaks or water damage occurred and also by the policy in effect at the time repair or replacement work was performed.

■ The question still remains as to what policy covers damages in the non-leaker cases. In the cases where repairs or replacement work was performed, the policies in effect at the time that work was

**15.** Although *Marathon* states that there is property damage without physical injury based on diminution in value, the basis for there being diminution in value is that the insured's gaskets were leaking and therefore the water system which the gaskets were part of became useless. *See id.*, 112 Ill.Dec. at 822, 514 N.E.2d at 485. It is also noted that *Wilkin I*, 140 Ill.Dec. at 912–13, 550 N.E.2d at 1037–38, holds that diminution in value is not itself property damage.

**16.** *Marathon* referred to the contract language involved in *Pittway* as being "virtually identical" to the language involved in *Marathon* and the present case. *Marathon*, 112 Ill.Dec. at 821, 514 N.E.2d at 484. *Marathon* does not expressly address why the addition of the word "physical" has no effect on the holdings of *Pittway* and *Elco*.

performed would provide coverage just as in the non-leaker cases. The non-leaker cases, however, can also fall under the exception. If, prior to leaks occurring, a residential unit's plumbing system could not be used out of fear that it would begin to leak and cause further damage, there would be loss of use without physical injury to tangible property. Under the exception, coverage would be in effect at the time of the occurrence, not the time of any physical injury. The policies define occurrence as "an accident including continuous or repeated exposure to conditions."[17] The continuous exposure to the defective plumbing system is the occurrence. *See Wilkin II,* 161 Ill.Dec. at 286, 578 N.E.2d at 932. Since exposure occurs from the time the Qest System is first installed in the residential unit, that is when the occurrence begins. Although property damage in the form of loss of use does not happen until later, the terms of the policy expressly provide that such property damage will be deemed to have occurred at the time of the occurrence. Any non-leaker claims for loss of use without physical injury are covered by the policy in effect at the time of installation and any subsequent policies in effect while the exposure continues.[18] *See Raymark,* 112 Ill.Dec. at 699, 514 N.E.2d at 165.

Liberty argues that the non-leaker cases should be considered to occur at the time the owner becomes aware the Qest System is defective. Liberty relies on *Bob Evans Farms, Inc. v. Excellent Builders, Inc.,* No. 84 C 506, 1988 WL 80137 (N.D.Ill. July 27, 1986). Using awareness or discovery as the measuring point, however, is not appropriate. First, the language of the insurance policy does not include any direct incorporation of a discovery rule. *See American Home Products Corp. v. Liber-*

*ty Mutual Insurance Co.,* 748 F.2d 760, 764 (2d Cir.1984) (New York law); *Dow Chemical,* 724 F.Supp. at 481. Second, the rationale for using such a measure is inapplicable or inconsistent with Illinois law. *Bob Evans* does not expressly set forth the rationale for its ruling, but relies on two cases. *See Mraz v. Canadian Universal Insurance Co.,* 804 F.2d 1325, 1328 (4th Cir.1986); *American Home Assurance Co. v. Libbey–Owens–Ford Co.,* 786 F.2d 22, 29–30 (1st Cir.1986). *Mraz* involved leakage of hazardous waste. The court chose the date of discovery because determining the date of first leakage was difficult, if not impossible. Such a rationale is inapplicable to the non-leaker cases because here the date of installation or repair is a better documented and more readily determinable date than the date the owner discovered or should have discovered the Qest System was defective.

*American Home* does not expressly set forth a rationale, but it cites two cases. One of the cases does not set forth a rationale. *See Bartholomew v. Insurance Co. of North American,* 502 F.Supp. 246 (D.R.I.1980), *aff'd sub nom., Bartholomew v. Appalachian Insurance Co.,* 655 F.2d 27 (1st Cir.1981). Also, *Bartholomew* involved the reverse situation where the insured wanted the occurrence to be later so that he could make a claim under new coverage. The other case relied on by *American Home* sets forth a rationale. *United States Fidelity & Guaranty Co. v. American Insurance Co.,* 169 Ind.App. 1, 345 N.E.2d 267, 271 (1976), involved damage to a structure from spalling bricks. The court held that the covered property damage was damage to the structure, not damage to the bricks themselves. Thus, replacement of the bricks was not covered, but the diminished value of the building caused by the fading brick was covered.

---

**17.** The newer policies refer to "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

**18.** *Young v. Insurance Co. of North America,* 870 F.2d 610, 611 (11th Cir.1989) (per curiam) (New York law), indicates that New York law does not recognize exposure to a potential hazard as a trigger for coverage. *Young,* however, involved a negligently installed gas grill that

caused $350,000 of fire damage to the house where it was located. Coverage for the fire damage was triggered by the actual occurrence of a fire just as coverage for water damage in the present case is triggered by the occurrence of leaks. *Young,* therefore, involved the general rule, not the exception that is presently held to be triggered by exposure.

The court reasoned, therefore, that the time at which the fading became noticeable measured whether the property damage fell within the coverage period. Such reasoning implicitly relies on diminution in value as being the property damage. This court has held, however, that diminution in value is not itself property damage; it is only a possible measure of compensation for property damage. While it is perfectly reasonable to presume that property values drop at the same time the defective nature of the product is discovered, such a rationale is not appropriately applied in this case because the drop in value of the structure is not itself property damage or an occurrence and, under the insurance policies, it is property damage that must fall within the policy period under the general rule or an occurrence that must fall within the policy period under the exception. For the foregoing reasons, *Bob Evans*'s discovery rule will not be followed.

IT IS THEREFORE ORDERED that:

(1) The intervening complaint of "plaintiff-intervenor" Travelers Indemnity Company of Illinois ("Travelers") is dismissed for lack of subject matter jurisdiction.

(2) Travelers is granted leave to intervene as a defendant-intervenor if a motion so to do is filed within five days of the date of this order. The Clerk of the Court is directed to amend the docket to redesignate Highlands as a defendant-intervenor.

(3) Travelers' motion to supplement the record is denied.

(4) Each party's motion for summary judgment is granted in part and denied in part.

(5) The Clerk of the Court is directed to enter a final declaratory judgment on all pending claims as follows: "Whereas Household Manufacturing, Inc. n/k/a Eljer

---

**1.** Although presented on July 5, the motions were filed on the dates indicated in the text. *See* N.D.Ill. Local Rule 12(d).

**2.** The Seventh Circuit subsequently granted a motion to voluntarily dismiss the appeal.

**3.** On July 5, a motion to amend to indicate that Count I was settled was granted and, since Highlands disclaimed any interest in Count II,

---

Manufacturing, Inc. ("Eljer"), Liberty Mutual Insurance Company, and Highlands Insurance Company have requested a declaration as to the policy period within which certain claims related to the Qest Qick/Sert II residential polybutylene system ("Qest System") fall under the various policies of insurance issued by the other parties to Eljer and its predecessor corporations, it is hereby declared that: (1) all covered claims for water damage are covered by the policy or policies in effect at the time the water damage occurred; (2) all covered claims for loss of use of structure as a result of leaks in the Qest system is covered by the policy in effect at the time the leak occurred; (3) all covered claims for repairing or replacing the Qest System are covered by the policy or policies in effect at the time the repair or replacement work is performed; (4) all covered claims where no leaks have occurred at the residential unit but where there has been a loss of use of property are covered by the policy or policies in effect from the time the Qest System was first installed until the unit's plumbing system was repaired or replaced."

## ON RECONSIDERATION

On June 14, 1991, this court ruled on the pending cross motions for summary judgment and directed the Clerk of the Court to enter judgment. A judgment was entered on June 18. On June 24, Eljer filed a notice of appeal. On June 28, Travelers filed a timely Rule 59(e) motion and on July 2 Eljer filed a timely Rule 59(e) motion.[1] *See* Fed.R.Civ.P. 59(e). The timely filing of the Rule 59(e) motions result in the notice of appeal having no effect[2] and this court has jurisdiction to consider the pending motions for reconsideration.[3] *Turner v. Chicago Housing Authority,* 771 F.Supp. 924, 925 & n. 1 (N.D.Ill.1991).

---

Highlands' intervention complaint was dismissed as moot. It is also noted that Liberty did not move for reconsideration, but was permitted to respond to the motions of Eljer and Travelers. Liberty expresses the view that the rulings on the merits of the insurance issues should not be disturbed except for one point on which it agrees with Travelers.

Travelers contends, and Liberty agrees, that Travelers' intervention as a plaintiff was proper and that Travelers was entitled to intervene as of right pursuant to Fed. R.Civ.P. 24(a). Travelers contends that it was adverse to Liberty on the noncumulation issue involved in Count I and that, even though adverse to Eljer on Count II, Liberty could not adequately represent Travelers' interests as to that issue. Count I was settled and Travelers does not dispute that presently it should be aligned as a defendant adverse to Eljer. Eljer expresses the view that the June 14 ruling as to intervention was correct.

There is no need to reconsider the issue of intervention. The better course is to realign Travelers and grant the pending motion to intervene as a defendant so as to cure any possible jurisdictional defects.

All three parties agree that the only issue they considered to be before the court was interpretation of the primary policies issued by Liberty. Although the umbrella policies "follow in form" and therefore any ruling would appear to apply equally to the umbrella policies, the parties are the masters of their lawsuit. The declaratory judgment will be amended to indicate that only the primary policies are at issue. Travelers and Liberty also contend that the issue of loss of use without physical injury to property was not before the court. That issue, however, was referred to in. the briefs and the court agrees with Eljer that there is a sufficient factual foundation to bring that issue before the court.

Eljer argues that the holding of *Wilkin I*, that incorporation of a defective product into a building constitutes property damage, must be deferred to as a statement of Illinois law. *See United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 193 Ill.App.3d 1087, 140 Ill.Dec. 907, 550 N.E.2d 1032 (1st Dist.1989) (*"Wilkin I"*), *aff'd*, 144 Ill.3d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991) (*"Wilkin II"*). The holdings of *Wilkin I* and earlier Illinois Appellate Court cases that Eljer relies on were fully discussed in the June 14 order and it was explained why that holding of *Wilkin I* could not be followed in light of *Wilkin II*.[4] Eljer does not raise any issues that require further discussion.

Eljer and Liberty are correct in pointing out that the ruling as to loss of use without physical injury is superficially inconsistent with the ruling in the earlier suit between Eljer and Liberty. *See Household Manufacturing, Inc. v. Liberty Mutual Insurance Co.*, No. 85 C 8519 (N.D.Ill. Feb. 10, 1987), *reconsideration granted*, (Nov. 16, 1987). In that case, it was held that all claims based on Qest System failures resulted from a single occurrence. Since loss of use without physical injury claims are based on the time of the occurrence that caused the loss of injury, it can be argued that the occurrence that caused the loss of use is the one continuous occurrence underlying this entire litigation.[5] The clause at issue provides: " **'property damage'** means ... loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period."[6] Loss of use is only *caused* during the time that the Qest System is in the residential unit and not yet repaired. Therefore, the June 14 ruling and declaratory judgment is consistent with the 1987 ruling that there is only one occurrence.

IT IS THEREFORE ORDERED that:

(1) Travelers' motion to intervene as a party defendant is granted.

(2) Travelers' motion to amend this court's memorandum opinion and order and

---

4. Travelers and Liberty also point to a recent decision of the First District Illinois Appellate Court that is consistent with the June 14 interpretation of *Wilkin I* and *Wilkin II. See Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.*, 218 Ill.App.3d 956, 161 Ill.Dec. 357, 578 N.E.2d 1003 (1st Dist.1991).

5. Eljer, the insured, makes no such argument; only the insurers make such an argument.

Since Eljer does not pursue such a line of argument, to the extent the policy is ambiguous, it need not be construed against the insurers.

6. Policies in the later years provide: " 'Property damage' that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the 'occurrence' that caused it."

judgment and Eljer's motion to alter or amend the judgment are granted in part and denied in part.

(3) The judgment dated June 14, 1991 and entered on the docket June 18, 1991 is vacated.

(4) The Clerk of the Court is directed to enter a final judgment dismissing Count I of Eljer's complaint as settled and Highland's complaint in intervention as settled and as to all other pending matters issue a final declaratory judgment as follows: "Household Manufacturing, Inc. n/k/a Eljer Manufacturing, Inc. ("Eljer"), Liberty Mutual Insurance Company ("Liberty"), and The Travelers Indemnity Company of Illinois have requested a declaration as to the policy period within which certain claims related to the Qest Qick/Sert II residential polybutylene system ("Qest System") fall under the various policies of primary insurance issued by Liberty to Eljer and its predecessor corporations. It is hereby declared that: (1) all covered claims for water damage are covered by the policy or policies in effect at the time the water damage occurred; (2) all covered claims for loss of use of structure as a result of a leak or leaks in the Qest system are covered by the policy or policies in effect at the time or times the leak or leaks occurred; (3) all covered claims for repairing or replacing the Qest System are covered by the policy or policies in effect at the time the repair or replacement work is performed irrespective of whether or not a leak occurred; and (4) all covered claims where water damage has not occurred at the residential unit but where there has been a loss of use of property are covered by the policy or policies in effect from the time the Qest System was first installed until the unit's plumbing system was repaired or replaced."