PITTWAY CORPORATION, Plaintiff-Appellant, *v.* AMERICAN MOTORISTS INSURANCE CO. *et al.*, Defendants-Appellees.

Second District   No. 76-288

Opinion filed December 15, 1977.

James E. O'Halloran, Jr., and Paul T. Lively, both of Bell, Boyd, Lloyd, Haddad & Burns, of Chicago, and Joslyn & Green, of Crystal Lake, for appellant.

McKenna, Storer, Rowe, White & Farrug and French & Rogers, both of Chicago, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:
Pittway Corporation, the plaintiff (hereinafter Pittway), appeals from a

summary judgment denying insurance coverage under its policy with the defendant, American Motorists Insurance Co. (American). Pittway also appeals from an order which dismissed its claim against the defendant, Marsh & McLennan, its insurance broker.

I

The claim against American arised from Pittway's exposure to liability for selling defective valve assemblies used in aerosol cans. The essential question is one of policy coverage.

Seaquest Valve, a division of Pittway, assembled the valves for use in aerosol cans from components furnished by others. Pursuant to an order from Helene Curtis, the distributor of hair spray, Seaquist Valve, ordered plastic valve bodies, a component of the valve assemblies, from Karnel Industries, a molder of plastic products. Seaquist provided Karnel with plans, specifications and a mold. Seaquist incorporated the valve bodies which it received from Karnel into its production of valve assemblies which it then delivered to Connecticut Chemical of Canada, Limited, who incorporated the valve assemblies into aerosol cans filled with hair spray. The hair spray products were then distributed by Helene Curtis.

Helene Curtis, however, was forced to scrap some of these aerosol hair spray products because of a leakage of hair spray which occurred when the aerosol was activated, a problem referred to in the industry as a "blowby." Helene Curtis made a claim for damages which Seaquist settled by paying $5,123.66. The parties refer to this as the "first loss."

From its investigation Seaquist believed that the malfunction was caused because the valve bodies furnished by Karnel had a "knife edge" rather than a "flat seat" as required by the specifications. Seaquist believed, however, that it was not a major departure from the specifications and that it could compensate for the defect by "clinching" the plastic valve body very tightly into the valve assembly. In his deposition a Seaquist executive stated that he believed that only a defective plastic valve body "in conjunction with a clinch which was on the weak end of our tolerances" would cause the malfunction.

After Seaquist had again supplied defective plastic valve bodies to Connecticut Chemical for use in Helene Curtis spray cans it found the "clinching" would not compensate for the defect and thus would not prevent "blowby." Both Connecticut Chemical and Helene Curtis made claims against Seaquist. On investigation of a random sample every can exhibited "blowby" leakage problems. Helene Curtis determined the product was not saleable and with the consent of Seaquist all of the products in issue were taken to a disposal dump. The parties referred to this as the "second loss."

Pittway notified American of both losses on April 24, 1970, some 16

months after it had received formal notice of the first loss from Helene Curtis on December 27, 1968. American denied coverage. Plaintiff settled the "second loss" for $47,215 and seeks recovery under the American policy.[1]

Various provisions of the American insurance policy bear on the issues. First, we must consider whether the damage incurred by Connecticut Chemical and Helene Curtis constitutes "property damage" under the insurance policy. The policy may be generally characterized as providing for comprehensive general liability coverage. As material to the issue of property damage, the policy states:

> "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * B. property damage."

And in the "Definitions," it states:

> " 'damages' includes damages * * * for loss of use of property resulting from property damage;
>
> * * *
>
> 'property damage' means injury to or destruction of tangible property."

Plaintiff contends that both the first and second losses constitute "property damage" within the meaning of the quoted provisions. The losses represent the value of the Helene Curtis hair spray products containing Seaquist valves which were destroyed due to the blowby malfunction but excluding any claim for the loss of the Seaquist valves themselves which were furnished by the plaintiff. Plaintiff acknowledges that the hair spray itself was not physically damaged. It argues, however, that since the aerosol products were scrapped because it was economically impossible to reuse the cans and their contents by removal of the defective valves and insertion of new valves, there was "property damage."

■■ American argues that since the Helene Curtis hair spray and the containers were not physically damaged by the defective valves, the decision to scrap the defective cans was purely a question of economics. We conclude, however, that the inclusion of the defective valve into the finished product under the circumstances of this case caused property damage to the product of a third party to the extent that the market value of the final product was diminished, less the value of the defective component furnished by Seaquist.

■■■ It is clear that Pittway could not recover for the value of the

---

[1] Pittway had also sued Karnel Industries alleging negligence in the production of the valve assemblies. The trial court entered summary judgment in favor of Karnel in that action and Pittway acknowledges that it is not appealing from that judgment even though it was included in the notice of appeal.

defective valve which its subsidiary Seaquist furnished. (See, *e.g.*, *Chambers Gasket & Manufacturing v. General Insurance Co. of America*, 29 Ill. App. 3d 998, 1001 (1975).) This loss is under one of the policy exclusions as injury to products manufactured by the named assured, and in fact Pittway does not seek recovery for this loss. However, there is Illinois authority that where a component is so intertwined with the entire mechanism that the defect necessarily results in damage to the completed product the component will be deemed to have caused property damage. (*Cf. Elco Industries v. Liberty Mutual Insurance Co.*, 46 Ill. App. 3d 936, 938 (1977).) Neither by the cases cited by the parties nor by our own research have we found an Illinois case which squarely holds that there must be physical harm to the completed product before an insured may recover for property damage under the general liability policy. However, we have found what we conclude to be a majority position which holds that the term "property damage" includes tangible property which has been diminished in value or made useless irrespective of any actual physical injury to the tangible property. See *Goodyear Rubber & Supply Co. v. Great American Insurance Co.*, 471 F.2d 1343, 1344 (9th Cir. 1973); *Sturges Manufacturing Co. v. Utica Mutual Insurance Co.*, 37 N.Y.2d 69, 371 N.Y. Supp. 2d 444, 332 N.E.2d 319, 322 (1975); *Thomas J. Lipton, Inc. v. Liberty Mutual Insurance Co.*, 34 N.Y.2d 356, 357 N.Y.Supp. 2d 705, 314 N.E.2d 37, 39 (1974); *Parker Products, Inc. v. Gulf Insurance Co.*, 486 S.W.2d 610, 615 (Tex. Civ. App. 1972). See also *Gulf Insurance Co. v. Parker Products, Inc.*, 498 S.W.2d 676, 679 (Tex. 1973); *Western Casualty & Surety Co. v. Polar Panel Co.*, 457 F.2d 957, 960-61 (8th Cir. 1972); *Geddes & Smith, Inc. v. Saint Paul Mercury Indemnity Co.*, 51 Cal. 2d 558, 334 P.2d 881, 885 (1959), see *Geddes & Smith, Inc. v. Saint Paul Mercury Indemnity Co.*, 63 Cal. 2d 602, 407 P.2d 868, 871, 47 Cal. Rptr. 564 (1965); *Hauenstein v. St. Paul-Mercury Indemnity Co.*, 242 Minn. 354, 65 N.W.2d 122, 125 (1954); *Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co.*, 281 F.2d 538, 541 (3d Cir. 1960); *Bundy Tubing Co. v. Royal Indemnity Co.* 298 F.2d 151, 153 (6th Cir. 1962); *Bowman Steel Corp. v. Lumbermens Mutual Casualty Co.*, 364 F.2d 246, 249 (3d Cir. 1966); *Arcos Corp. v. American Mutual Liability Insurance Co.*, 350 F. Supp. 380, 383 (E.D. Pa. 1972), *aff'd* 485 F.2d 678 (3d Cir. 1973).

■■ In the case before us damage to tangible property, that is the completed product, is alleged and not mere economic damage in the nature of loss of investment, anticipated profits and financial interests. (Compare *Hartford Accident & Indemnity Co. v. Case Foundation Co.*, 10 Ill. App. 3d 115, 123-24 (1973).) We conclude that the damage to the completed product exclusive of the value of the defective product furnished by Pittway amounts to damage to tangible personal property within the terms of the policy.

American principally relies upon the decisions of the Seventh Circuit

Court of Appeals in the cases of *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.*, 508 F.2d 417 (7th Cir. 1975), which was followed by that Circuit in *Dreis & Krump Manufacturing Co. v. Phoenix Insurance Co.*, 458 F.2d 681 (7th Cir. 1977), for the proposition that the mere inclusion of a defective component where no physical harm results to other parts of the product does not constitute property damage.

In *Hamilton Die,* the court was dealing with a case in which the manufacturer of defective tennis racket frames sought to recover for the damage to its own defective product as well as for the value of the grip and strings added to the defective frame. In its narrow holding the court refused to permit the recovery of damages under a complaint which alleged that plaintiff's supply of tennis rackets was not sufficient to meet the demand, that plaintiff was required to refund the purchase price of the defective rackets returned to it and that its reputation was damaged thereby. (508 F.2d 417, 418-19.) In the case before us, however, the plaintiff is not seeking coverage for his defective product on the theory that it has been integrated into the finished product but seeks only an amount which represents the resultant damage to the cans and the contents of third parties caused by his defective valve. We do not disagree with the result in *Hamilton.* If the opinion is read to support the proposition argued by defendant, that coverage for property damage under the policy is dependent on physical injury to property, however, we do not agree.

In *Dreis & Krump,* the insured had allegedly manufactured a defective brake which the buyer was to incorporate into his machinery. The purchaser sought recovery for loss of use of a special structure built to house the defective press brake and for amounts spent in rectifying the defect. The court held that the complaint of the purchaser did not allege damage to tangible property and therefore was not within the property damage coverage. The case is clearly distinguished on its facts, in that there was no actual injury to tangible property. In our case there is injury in the sense of the diminution in value of the product manufactured and owned by a third party.

We therefore conclude that we cannot decide the case purely on the issue of whether the type of damage was property damage within the definitions of the policy. If this were the determinative issue, we would of necessity be required to remand for evidentiary proof directed at the amount that the value of the completed product had been diminished by the inclusion of the defective valve assemblies.

## A. The "Second Loss"

We do not reach this result inasmuch as we conclude that the "second loss" is excluded under another provision of the policy. Exclusion "K" essentially provides that there may be no recovery where the property

damage results from the failure of the insured's products to perform its intended function if such failure is due to the mistake or deficiency in any design, formula, plan or specification developed by the insured, except where the property damage results from "active malfunctioning" of the insured's product of work.

Setting aside the question of active malfunction for the moment, we note that in *Dawe's Laboratories v. Commercial Insurance Co.*, 19 Ill. App. 3d 1039, 1048-49 (1974), the exclusion was construed to require that:

> "* * * two concurrent factors must be present to prevent coverage; the formula must have been prepared or developed by the plaintiff and the failure must have been due to a mistake or deficiency in the formula itself."

Applying the language of the exclusion to this case if the design of the valve assemblies was developed by the insured and the failure of the valve assemblies was due to a mistake or deficiency in design there is no insurance coverage. Pittway argues that it did not make any changes in the original specifications of the valves and that the loss was caused by a manufacturing error in the production of the valve bodies by Karnel and not by any design error by Pittway.

Relating this argument to the "second loss" we must disagree. Among the meanings of the term "design" is "a reasoned purpose; intention* * *." (American Heritage Dictionary of the English Language 357 (1973).) After it had learned about the first failure of the valves and found that it was due to the manufacture of a plastic valve body with a knife edge rather than a flat edge contrary to specifications, Pittway conceived the reasoned purpose and intention to make the defective valve a part of a modified design. This was based upon its determination that the knife edge and the tight clinch together would make the produce usable. It thereupon distributed the product with the modified design. The record also shows that both the original and the modified design were not disclosed to Helene Curtis. Thus there can be no doubt that the decision to release valve assemblies containing the defective plastic valve bodies was a decision made solely and intentionally by the plaintiff.

Plaintiff, however, argues that the exception to exclusion "K" is applicable. It argues that it was the active malfunctioning in the form of leakage or blowby which rendered the Helene Curtis products valueless and necessitated their destruction.

■■ Again with reference to the second loss we cannot agree. An insurance contract, like any other, is to be interpreted from an examination of the complete document and not from its isolated parts. (*Cobbins v. General Accident Fire & Life Assurance Corp. Ltd.*, 53 Ill. 2d 285, 290 (1972).) If possible, meaning and effect will be given to every part of the policy. (*State Security Insurance Co. v. Goodman*, 6 Ill. App.

3d 1008, 1012 (1972).) Under the circumstances before us, we do not find the active malfunctioning exception to exclusion "K" to be incompatible with the remainder of the provision. (*Contra, Sturges Manufacturing Co. v. Utica Mutual Insurance Co.*, 37 N.Y.2d 69, 371 N.Y.Supp.2d 444, 332 N.E.2d 319, 322.) The record indicates that only a very small percentage of the aerosol cans were ever actually activated. In this sense the blowby malfunction was entirely passive. But even the small percentage of cans which exhibited the blowby malfunction did no more than fail to serve their intended purpose. The only activity involved in the blowby malfunction was the malfunction itself. We conclude that a product does not actively malfunction when it merely fails to serve the purpose for which it was intended. 3 Long, The Law of Liability Insurance §13 (1966).

As to the second loss we do not reach the question whether exclusion "N" of the policy is applicable to the loss. This exclusion denies coverage for damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the named insured's products or work if they are withdrawn from the market or from use because of any known or suspected defect or deficiency. The record on summary judgment is not entirely clear as to whether the insured rather than Helene Curtis withdrew the product.

■■ Similarly as to whether the second loss was an "occurrence" within the policy which was defined in the policy as "an accident * * * neither expected nor intended from the standpoint of the insured," a question of fact appears to be involved. This may not be appropriately determined at the summary judgment stage and therefore we do not base our conclusion on this issue.

### B. The "First Loss"

The issue as raised by the claim for damages for the "first loss" must be approached from a different standpoint. The record does not indicate that plaintiff had any knowledge, intention or purpose to release valve assemblies containing the defective plastic valve bodies. In addition as to this loss it may also be a question of fact as to whether the various other exclusions which have been mentioned are applicable. Nevertheless we conclude that Pittway is also precluded from claiming coverage as to the "first loss."

■■ American has contended that the trial court properly denied coverage as to the first loss because of Pittway's failure to give it timely notice. Plaintiff's complaint establishes that while it received formal notice of the first loss from Helene Curtis on December 27, 1968, it did not notify American until April 24, 1970. Pittway argues that it did not give notice to American because it in good faith relied upon Marsh & McLennan's expert opinion at that time that no coverage existed. It is true

that notice to an insurer may be given within a reasonable time and it follows that prompt notice may be excused when it is not obvious to a reasonable person that coverage exists prior to the time the notice is given. (*Farmers Automobile Insurance Association v. Hamilton,* 64 Ill. 2d 138, 142 (1976).) Conceivably on this issue standing alone a question of fact could be said to be presented on this record which would require a trial and make summary judgment inappropriate.

■■ However, at the time Pittway notified American of the first loss Helene Curtis' claim had already been settled for $5,123.66 and the hair spray cans had been scrapped. The policy before us contains the usual cooperation clause which, generally stated, provides that the insured shall not make any voluntary payment without the consent of the insurance company. The cooperation clause is to prevent collusion between the insured and the injured party as well as to make possible the insurer's investigation. (*MFA Mutual Insurance Co. v. Cheek,* 66 Ill. 2d 492, 496 (1977).) However, prejudice must be shown by an insurer seeking to avoid responsibility because of the breach of the cooperation clause. (*MFA Mutual Insurance Co. v. Cheek,* at 500.) The record before us establishes substantial prejudice as a matter of law since by the time American received notice of the first loss the damaged property had been scrapped making inspection or further investigation impossible in any reasonable sense. Therefore American was substantially prejudiced in any defense of the primary action for recovery of the first loss.

## II

Pittway contends in the alternative that its insurance broker, Marsh & McLennan, was negligent because it erroneously advised Pittway that the first loss was not covered under the insurance policy with American. It suggests that in the event we find coverage as to the first loss, we should also find that Marsh & McLennan was improperly dismissed at the trial level. We disagree.

Plaintiff concedes that it "is not attempting to make Marsh & McLennan a guarantor that its interpretations of insurance policies will be subsequently and consistently followed by the judiciary." It claims, rather, that Marsh & McLennan breached its duties to plaintiff "by failing to exercise due diligence in investigating the question of coverage and in misrepresenting that coverage did not exist."

■■ As a general rule an insurance broker is bound to exercise reasonable skill and diligence in the transaction of the business entrusted to him and will be responsible to his principal for any loss resulting from his failure to do so. (*Kane Ford Sales, Inc. v. Cruz,* 119 Ill. App. 2d 102, 104 (1970).) In this regard we observe that the primary function of an insurance broker as it relates to an insured is to faithfully negotiate and

procure an insurance policy according to the wishes and requirements of his client. (*City of Chicago v. Barnett*, 404 Ill. 136, 141 (1949); *Galiher v. Spates*, 129 Ill. App. 2d 204, 206-07 (1970).) This is, in fact, also the function which the insurance broker is licensed to perform. Ill. Rev. Stat. 1975, ch. 76, pars. 1065.37, 1065.39.

The law places a particular burden on an insurance broker to exercise competence and skill when he renders the service of procuring insurance coverage. (See *National Boulevard Bank v. Brokerage Resources, Inc.*, 42 Ill. App. 3d 940, 943 (1976); *Gothberg v. Nemerovski*, 58 Ill. App. 2d 372 (1965); *Hardt v. Brink*, 192 F. Supp. 879 (W.D. Wash. 1961); Annot., 72 A.L.R. 3d 704, 706 (1976); Annot., 72 A.L.R. 3d 747 (1976).) There are also cases related to the procuring of insurance coverage where a broker may be held responsible for statements or conduct which lead the insured to believe, that, for example, a cancellation notice will not be effective. See Annot., 3 A.L.R. 3d 1135 (1965).

Plaintiff admits Marsh & McLennan is its agent and not that of the insurance company. Plaintiff does not claim that Marsh & McLennan's actions are binding on American. Nor does plaintiff allege bad faith or fraud on the part of Marsh & McLennan. Consequently, we view plaintiff's contention as one which essentially seeks to impose upon insurance brokers the duty to advise their customers of the import and meaning of the provisions of insurance policies which have previously been faithfully procured according to the customer's requirements. In the present instance plaintiff's contention would also require the broker to advise plaintiff as to the future course of judicial precedent.

■■ Here, we find that the burden was on plaintiff to know the import and meaning of the insurance contract with American which it accepted and retained. (See *Pollock v. Connecticut Fire Insurance Co.*, 362 Ill. 313, 320 (1935); *Foster v. Crum & Forster Insurance Cos.*, 36 Ill. App. 3d 595, 598 (1976).) Under the circumstances presented by this record, the responsibility to determine whether the loss was covered did not shift to plaintiff's insurance broker. The complaint against Marsh & McLennan does not state a case of negligence and was properly dismissed by the trial court.

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.

RECHENMACHER and GUILD, JJ., concur.