In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-1662

ST. PAUL GUARDIAN INSURANCE COMPANY, et al.,

*Plaintiffs-Appellees,*

*v.*

WALSH CONSTRUCTION COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-10324 — **Virginia M. Kendall**, *Judge.*

ARGUED JANUARY 24, 2024 — DECIDED APRIL 29, 2024

Before WOOD, SCUDDER, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* In 2003, the City of Chicago contracted with Walsh Construction Company to manage the construction of a canopy and curtain wall system at O'Hare International Airport. As part of that project, Walsh entered into a contract with Carlo Steel Corporation, which in turn subcontracted with LB Steel, LLC to fabricate and install steel columns to support the wall and canopy. Per their agreement, LB Steel listed Walsh as an additional insured in its commercial

general liability (CGL) insurance policies. Several years into the project, the City discovered cracks in the welds of the steel columns and sued Walsh for breaching its contract. Walsh, in turn, sued LB Steel under its subcontract. Walsh also asked LB Steel's insurers to defend it in the City's lawsuit, but they never did. Walsh eventually secured a judgment against LB Steel, which led it to declare bankruptcy. Walsh then sued LB Steel's insurers to recover the costs of defending against the City's suit and indemnification for any resulting losses.

In this suit, LB Steel's insurers seek a declaratory judgment that LB Steel's CGL policies do not cover the expenses Walsh incurred to repair the defective columns at the City's insistence. They also seek a declaratory judgment that they did not have a duty to defend Walsh in the City's underlying suit. The parties filed cross-motions for summary judgment, and the district court granted summary judgment in favor of the plaintiff insurers on both issues. This case turns upon the question of whether, under Illinois law, the defects in the welds and columns constitute "property damage" under LB Steel's CGL policies. We conclude that they do not and affirm.

## I.  Background

### A.  The Project

In 2003, the City hired Walsh as the general contractor for the Façade and Circulation Enhancement (FACE) project at O'Hare. The FACE project involved building and installing a new canopy for Terminals 1, 2, and 3. In addition to the canopy, the project called for the construction of a steel and glass curtain wall that would be integrated with the canopy at Terminals 2 and 3. Walsh contracted with Carlo to manufacture the steel and curtain wall. Carlo, in turn, subcontracted with

LB Steel to manufacture and install the steel elements of the wall, which included steel columns, hammer heads, and box girders. The subcontract between Carlo and LB Steel included an indemnity provision that required LB Steel to indemnify Carlo and Walsh for any property damage resulting from LB Steel's negligent performance.

The City discovered cracks in welds performed by LB Steel in December 2004 and again in November 2005, leading it to question the structural integrity of the canopy system. As a result, the City required Walsh to install shoring to the columns. In February 2008, Walsh and the City entered into a limited settlement agreement in which Walsh agreed to conduct repairs to the columns at its own expense.

### B. The Underlying Suit

In November 2008, the City sued Walsh in Illinois court for breach of contract and contractual indemnity to recover the costs the City incurred to investigate and remediate the defective welds. At the time, LB Steel had CGL policies in place with St. Paul Guardian Insurance Company, Travelers Property Casualty Company of America, and the Charter Oak Fire Insurance Company (Insurers). Walsh was listed as an additional insured. So, in January 2010, Walsh tendered its defense of the City's claims to the Insurers under LB Steel's policies. The Insurers acknowledged receipt and asked for additional information from Walsh, but they never provided a final coverage decision and did not defend Walsh in the City's lawsuit.

Walsh eventually agreed to settle the City's damages claims for $10 million. Then, Walsh filed its own third-party complaint against LB Steel for breach of contract, professional negligence, and fraud. The Illinois trial court found for Walsh

on its breach of contract claim and entered a judgment against LB Steel awarding Walsh $19,187,304. LB Steel appealed and filed for bankruptcy four days later.

On appeal, the Illinois appellate court affirmed the trial court's judgment as to Walsh's contract claim but reversed the trial court with respect to certain credits and setoffs. Walsh and LB Steel then reached a bankruptcy settlement that provided Walsh with $3,367,350 and a $24,132,650 unsecured claim against LB Steel's bankruptcy estate.

### C.  Procedural History

That brings us to this suit. In November 2015, the Insurers sued Walsh in the Northern District of Illinois seeking a declaratory judgment that LB Steel's CGL policies do not cover the $19 million judgment against LB Steel or the subsequent bankruptcy settlement. The Insurers also sought a declaratory judgment that they did not have a duty to defend Walsh in the underlying suit against the City. In response, Walsh brought four counterclaims, seeking 1) indemnification under the policies for the $24,132,650 Walsh claimed against LB Steel, 2) recovery of attorneys' fees and costs Walsh incurred in defending itself against the City, 3) indemnification of the $10 million Walsh paid to the City under the settlement and any additional costs incurred in remediating the damage, and 4) sanctions pursuant to 215 Ill. Comp. Stat. 5/155 (§ 155).

Ruling on cross-motions for summary judgment, the district court found in favor of the Insurers, concluding that they had neither the duty to indemnify nor the duty to defend under the CGL policies. The court also denied Walsh's request for sanctions under § 155. In short, the court reasoned that, because the physical damage at issue was limited to LB Steel's

own products, it did not constitute "property damage" as that term appears in the policies, thereby precluding coverage. As for the duty to defend, the court determined that the Insurers had none, because the City's underlying claims did not implicate potential coverage under LB Steel's policies. This appeal followed.

## II.  Legal Standard

Summary judgment is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a). We "review the district court's interpretation of the insurance policy at issue and the resulting grant of summary judgment *de novo*." *Lexington Ins. Co. v. Chi. Flameproof & Wood Specialties Corp.*, 950 F.3d 976, 980 (7th Cir. 2020). The parties agree that Illinois law controls. *See Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010).

An insurer in Illinois has the duty to indemnify when "the insured becomes legally obligated to pay damages in the underlying action that gives rise to a claim under the policy." *Allied Prop. & Cas. Ins. Co. v. Metro N. Condo. Ass'n*, 850 F.3d 844, 847 (7th Cir. 2017) (quoting *Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 491 (Ill. 2001)). Once the insured has incurred liability, the duty to indemnify only arises if "the insured's activity and the resulting loss or damage *actually* fall within the CGL policy's coverage." *Id.* (quoting *Eljer*, 757 N.E.2d at 492). An insurer's duty to defend is broader and is triggered "if the complaint alleges facts that are even potentially within the coverage of the insurance policy." *Ohio Cas. Ins. Co. v. Bazzi Constr. Co.*, 815 F.2d 1146, 1147 (7th Cir. 1987) (citing *Md. Cas. Co. v. Peppers*, 355 N.E.2d 24, 28 (Ill. 1976)).

The insured carries the initial burden to show that its loss falls within the terms of the policy. *St. Michael's Orthodox Cath. Church v. Preferred Risk Mut. Ins. Co.*, 496 N.E.2d 1176, 1178 (Ill. App. Ct. 1986). If an insured meets this burden, the burden shifts to the insurer to prove that a policy exclusion applies. *Santa's Best*, 611 F.3d at 347. If an exclusion applies, the burden then shifts back to the insured to show that an exception to the exclusion applies. *Id.*

We "must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Eljer*, 757 N.E.2d at 491 (internal quotation marks omitted). To do so, we give policy provisions "their plain, ordinary, and popular meaning." *Id.* (emphasis omitted) (quoting *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1215 (Ill. 1992)). If the policy language is ambiguous and therefore "susceptible to more than one reasonable meaning," the policy should be construed strictly against the insurer. *Sproull v. State Farm Fire & Cas. Co.*, 184 N.E.3d 203, 209 (Ill. 2021). But we will not "strain to find ambiguity in an insurance policy where none exists." *Hess v. Est. of Klamm*, 161 N.E.3d 183, 188 (Ill. 2020).

### III. Analysis

Walsh presents three arguments on appeal. First, Walsh argues that the district court erred when it determined that the Insurers' policies do not cover Walsh's damages. Second, Walsh contends that the district court erred when it found that the Insurers owed no duty to defend Walsh in the underlying suit. Finally, Walsh argues that the district court should have imposed sanctions on the Insurers pursuant to § 155.

### A. Property Damage

We begin with the question of covered damages. The Insurers' complaint first seeks a declaratory judgment that LB Steel's policies do not cover the judgment against LB Steel in the underlying litigation or the subsequent settlement. LB Steel's insurance policies with St. Paul, Travelers, and Charter Oak cover "bodily injury" or "property damage" that results from an "event" or "occurrence." Here, the dispute centers around the meaning of "property damage," which is defined in each of the policies.

To determine the scope of coverage, we look to the "language of the initial grant of coverage in the insuring agreement[s]." *See Acuity v. M/I Homes of Chicago*, LLC, 2023 IL 129087, ¶ 52 (Ill. 2023). Important for our purposes, LB Steel's policies only cover damage to the property of others—not to LB Steel's own property. In the St. Paul policies, this is evident from the definition of "property damage," which they define as "physical damage to tangible property *of others*." Unlike the St. Paul policies, the policies with Travelers and Charter Oak define "property damage" as "physical injury to tangible property" without limiting the definition to the property of others. But these policies separately contain a "Your Product" exclusion, which excludes coverage for "'[p]roperty damage' to 'your product' arising out of it or any part of it." "Your product," in turn, is defined as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by … you." Thus, in order to succeed on the coverage question, Walsh must demonstrate some physical injury to tangible property *beyond* the steel elements fabricated by LB Steel.

The problem is that Walsh has not met this burden. For example, Walsh has not identified any cracks in the glass, damage to concrete, or alterations to any other parts of the canopy or curtain wall not provided by LB Steel. Walsh does note that it had to install retrofit structures around the affected columns, but those retrofits were only installed to remedy the defects in the columns themselves.

Instead of providing evidence of any actual, physical damage to something other than what LB Steel manufactured, Walsh offers a different, more attenuated theory of property damage: that once the welding in the columns holding the canopy's weight cracked, the entire canopy structure became structurally unstable. As Walsh sees it, this structural instability was a "harmful physical change to the canopy system" sufficient to trigger coverage.

There is a fatal flaw in this theory, however. Essentially, what Walsh is saying is that the defective welds increased the *potential* for the canopy to collapse. At the same time, it offers no evidence that this "structural instability" had manifested itself in any physical way (other than in the LB Steel columns themselves). But under Illinois law, an increased potential for future property damage does not itself constitute property damage. The Illinois Supreme Court made this clear in *Eljer*, 757 N.E.2d. at 502. There, the policyholders manufactured residential plumbing systems that had an estimated five percent failure rate. *See id.* at 486, 502. While some claimants experienced actual property damage after their plumbing systems leaked, others removed the systems before they leaked as a preventive measure. *Id.* at 487. These proactive claimants, the Illinois Supreme Court explained, had no claim for indemnity against the insurer because their systems had performed

as intended and had yet to cause any physical injury to tangible property. *Id.* at 502. And the court recently reaffirmed this reasoning in *Acuity*, 2023 IL 129087, at ¶ 37.

LB Steel's defective welds are much like the compromised plumbing systems of the chary homeowners. Both may create the potential for future damage to the property of others, but where such damage has yet to manifest, there is no "property damage" that triggers coverage under the CGL policies. Furthermore, just as the proactive homeowners did in *Eljer*, Walsh took preventative measures by retrofitting LB Steel's defective columns before they could cause damage to other parts of the canopy system. And, just as in *Eljer*, Walsh's preventative costs are economic losses not recoverable under the policies.

Setting *Eljer* to the side, Walsh protests that this rule creates a "perverse outcome" because it penalizes the company for taking steps to prevent the canopy's catastrophic collapse. But there are many reasons (economic and otherwise) why a party in Walsh's shoes might take steps to prevent such a calamitous failure (avoiding millions of dollars in potential liability being just one). Remember too that LB Steel—not Walsh—is the policyholder. To find coverage here would mean that manufacturers like LB Steel could perform defective work without consequence, knowing that they could later recoup any resulting adverse judgments under their CGL policies. That can hardly be what the contracting parties intended.

Taking a slightly different tack, Walsh argues that there is property damage here because LB Steel's component parts are so intertwined with the canopy structure that damage to the steel columns necessarily means damage to the canopy as a

whole. For support, Walsh relies on *Pittway Corp. v. American Motorists Insurance Co.*, 370 N.E.2d 1271 (Ill. App. Ct. 1977). In that case, a valve manufacturer supplied defective valves that were used in aerosol hairspray cans. *Id.* at 1272–73. The defective valves caused the cans to leak, rendering them useless. *Id.* The Illinois Appellate Court held that the incorporation of the defective valves into the cans constituted property damage to the cans as a whole. *Id.* at 1274. In doing so, the court concluded that a defective valve caused property damage "to the extent that the market value of the final product [the can] was diminished." *Id.* at 1273–74.

*Pittway* is unhelpful to Walsh for two reasons. First, the policy at issue in *Pittway* defined property damage as "injury to or destruction of tangible property." *Id.* at 1273. In line with this definition, the court found that property damage could include property that has "been diminished in value or made useless *irrespective of any actual physical injury to the tangible property*." *Id.* at 1274 (emphasis added). But the CGL policies here define property damage as "*physical* injury to tangible property" and "*physical* damage to tangible property of others." And in *Eljer*, the Illinois Supreme Court announced that when the definition of property damage requires physical injury, property damage "does not take place upon the occurrence of an economic injury, such as diminution in value." *Eljer*, 757 N.E.2d at 500.

Second, even if we accept the premise that, where a part is so intertwined with the entire mechanism, damage to the part constitutes damage to the whole, this is not what we have here. What made the cans in *Pittway* unique was that once the defective valves broke, the cans had to be scrapped because it was "economically impossible" to fix them. *Pittway*, 370

N.E.2d at 1273. Here, unlike the cans in *Pittway*, the damage to the columns did *not* require the entire canopy to be taken down and rebuilt. Indeed, Walsh restored the canopy's structural integrity by retrofitting the defective columns. The outcome may be different if physical abnormalities in the columns required Walsh to disassemble the canopy and start anew, but that was not the case.

In sum, Walsh has not suffered any covered losses because its damages were limited to LB Steel's own defective work.[1] Accordingly, the Insurers are not required to indemnify Walsh for its losses. We therefore affirm the district court's grant of summary judgment in favor of the Insurers on Count I of the Insurers' Amended Complaint. We also affirm the district court's denial of summary judgment as to coverage in Count I and the duty to indemnify in Count III of Walsh's Counterclaim.

## B. Duty to Defend

The Insurers also seek a declaratory judgment that they had no duty to defend Walsh against the City's claims in the underlying suit. An insurer has a duty to defend when "the complaint's allegations fall within or potentially within the coverage provisions of the policy." *Lyons v. State Farm Fire & Cas. Co.*, 811 N.E.2d 718, 721 (Ill. App. Ct. 2005); *accord Chi. Flameproof*, 950 F.3d at 980. Because a complaint "need not allege or use language affirmatively bringing the claims within

---

[1] The Insurers also argue that there was no "event" or "occurrence" triggering coverage under the policies. Because we conclude that there was no "property damage" under the Insurers' policies, we need not reach the question of whether there was an "event" or "occurrence" triggering coverage.

the scope of the policy," the duty to defend is broader than the duty to indemnify. *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 827 (7th Cir. 1992) (quoting *W. Cas. & Sur. Co. v. Adams Cnty.*, 534 N.E.2d 1066, 1068 (Ill. App. Ct. 1989)).

Whether there was a duty to defend depends on the facts underlying a plaintiff's complaint, not the specific legal theory on which the plaintiffs based their claims. *See Chi. Flameproof*, 950 F.3d at 980. To determine whether there is a duty to defend, Illinois courts follow the so-called "eight-corners rule." *United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 579–80 (7th Cir. 2021). Under that rule, courts determine the duty to defend by looking "only within the four corners of the insurance policy and the four corners of the complaint for which defense is sought." *Id.* (citing *Pekin Ins. Co. v. St. Paul Lutheran Church*, 78 N.E.3d 941, 951 (Ill. App. Ct. 2016)).

The threshold for pleading a duty to defend in Illinois is low. *Pekin Ins. Co. v. AAA-1 Masonry & Tuckpointing, Inc.*, 81 N.E.3d 1040, 1045 (Ill. App. Ct. 2017). Indeed, courts have used very broad language to describe the scope of the duty. *See, e.g.*, *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020) ("An insurer can only refuse to defend if the allegations of the underlying complaint preclude any possibility of coverage.") (quoting *Ill. Tool Works, Inc. v. Travelers Cas. & Sur. Co.*, 26 N.E.3d 421, 428 (Ill. App. Ct. 2015)).

But it must be said that, although broad, "the insurer's duty to defend … is not without limits." *Lagestee-Mulder, Inc. v. Consol. Ins. Co.*, 682 F.3d 1054, 1059 (7th Cir. 2012). Notwithstanding the breadth of the duty, the claim against the insured must still contain "explicit factual allegations that potentially fall within policy coverage." *Id.* at 1058–59

(quoting *Amerisure Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 810 (7th Cir. 2010)). As applied here, the City's allegations must somehow indicate that there might have been—or could have been—damage to parts of the canopy not supplied by LB Steel. While we must peruse the City's allegations with care, we "will not read into the complaint facts that are not there." *Id.* at 1059 (quoting *Pekin Ins. Co. v. Roszak/ADC, LLC*, 931 N.E.2d 799, 806 (Ill. App. Ct. 2010)).

Here, the City's Third Amended Complaint limits its allegations to LB Steel's defective welds and steel and the costs of repairing them. For example, the City alleged that "[n]umerous of the *welds* installed by Walsh … contain unacceptable amounts of slag, cracks and other unacceptable [ ] flaws." The City also asserts that "Walsh breached its contractual obligations by providing *welds* containing slag and other irregularities." The complaint does not give even the slightest suggestion that LB Steel's defective welds might have caused damage to other parts of the canopy system.[2]

Scanning the complaint to overcome this hurdle, Walsh points us toward the City's conclusory allegation that its damages included costs associated with "repair." For example, Walsh recites a paragraph in the complaint that lists the City's damages to include "costs associated with investigation, loss of competitive advantage, removal, *repair* and/or replacement, additional costs of construction, diminution of value, and

---

[2] As we have made plain, we agree with our dissenting colleague that the City's complaint need not plead "an explicit factual allegation that the defective structural welds damaged the canopy." We only require the complaint to somehow signal that there *might have been* or *could have been* covered damages—in other words, that there was the "potential" for coverage as Illinois cases require.

costs for consultants and attorneys." According to Walsh, this broad boilerplate language (we know it is boilerplate because the exact words are repeated in other counts the City brought against other defendants for other parts of the FACE project) is enough to put the Insurers on notice that the defective welds may have caused physical damage to non-LB Steel components, thereby potentially implicating the policies.

But we think that this general assertion falls short for two reasons. First, the complaint makes clear at paragraph 102 that the "repairs" necessitated by LB Steel's defective welds were repairs to the "welding of the canopy" and not to other canopy structures or components. Second, if we accept Walsh's theory, an insurer would have a duty to defend any lawsuit where the complaint contains a generalized statement of damages or a conclusory request for relief. The duty to defend may be broad, but Illinois law does not permit us "to speculate about possible factual scenarios that are absent from the claim itself." *Lagestee-Mulder*, 682 F.3d at 1059 (quoting *Microplastics*, 622 F.3d at 814).[3] After carefully examining this

---

[3] The dissent emphasizes that the City's complaint does not "foreclose the possibility that the defective welds caused physical damage to the other elements of the canopy." In doing so, it maintains that "silence has a legal consequence under Illinois law." But the notion that "silence" can somehow trigger the duty to defend cuts against the fact that the potential for covered damages must be found somewhere in the four corners of the complaint. *See Prate Roofing*, 7 F.4th at 579–80; *Microplastics*, 622 F.3d at 812 ("The duty to defend applies only to facts that are explicitly alleged; it is the actual complaint, not some hypothetical version, that must be considered.") (internal quotation omitted); *see also U.S. Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930 (Ill. 1991) ("If the underlying complaints *allege facts* within or potentially within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent.") (emphasis added). A rule that would impose a duty to

complaint, we conclude that the Insurers did not have a duty to defend Walsh in the underlying action based upon Illinois's eight-corners rule.

As a final note, we do not think the outcome here will incentivize insurers to "lay low" and intentionally delay in making coverage decisions. Insurers are already incentivized to defend when—unlike here—the underlying facts show a potential for coverage. An insurer who fails to defend but is later found to have a duty to indemnify foregoes having any input in how the underlying lawsuit is litigated. They might give up certain defenses, for example. Or they might be forced to pay a settlement that they would have negotiated differently had they defended the suit themselves. Moreover, insurers that delay coverage decisions may face liability under Illinois law for improper claims practices. 215 Ill. Comp. Stat. 5/154.6. Given these real concerns, an insurer has an incentive to defend (perhaps under a reservation of rights letter), and when an insurer does not, it does so at its own risk.

In sum, the City's underlying claims against Walsh did not contain allegations falling within or potentially within the coverage provisions of the CGL policies. As a result, the complaint did not trigger the Insurers' duty to defend Walsh under Illinois law. Accordingly, we affirm the district court's grant of summary judgment in favor of the Insurers as to Count II of the Insurers' Amended Complaint and Count II of Walsh's Counterclaim.

---

defend unless the underlying complaint affirmatively disavows any and all hypothetical damage to the property of others is not only unrealistic (why would a plaintiff ever do that?), but boundless.

## C.  Section 155 Sanctions

Illinois law gives courts the authority to impose sanctions when there was "an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable." 215 Ill. Comp. Stat. 5/155(1). However, it is "neither vexatious nor unreasonable to litigate a 'bona fide dispute concerning the scope and application of insurance coverage,' let alone to deny coverage based on a position that prevails." *PQ Corp. v. Lexington Ins. Co.*, 860 F.3d 1026, 1038 (7th Cir. 2017) (quoting *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000)). Because we find that the Insurers' coverage position prevails, we agree with the district court that sanctions are not warranted. We therefore affirm the district court's grant of summary judgment for the Insurers on Count IV of Walsh's Counterclaim as well.

## IV. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

SCUDDER, *Circuit Judge*, concurring in part and dissenting in part. I agree with the majority that LB Steel's defective welds did not cause "property damage" within the meaning of the St. Paul, Travelers, and Charter Oak policies. I respectfully part ways, however, with the majority's conclusion that the insurers had no duty to defend Walsh in its litigation with the City. In my opinion, the majority's reasoning stands in irreconcilable tension with a floodtide of Illinois law broadly defining the contours of the duty to defend and threatens to dilute the scope of that right in cases like this one, where the potential for coverage is in no way foreclosed by the four corners of the underlying complaint.

Under Illinois law, the duty to defend is serious business. An insurer's duty to defend is "much broader" than its duty to indemnify. *Crum & Forster Managers Corp. v. Resolution Tr. Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1993). "Refusal to defend," the Illinois Supreme Court has emphasized, "is unjustifiable unless it is clear from the face of the underlying complaint that the facts alleged do not fall potentially within the policy's coverage." *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992). Put another way, "[a]n insurer can refuse to defend only if the allegations of the underlying complaint preclude *any* possibility of coverage." *Ill. Union Ins. Co. v. Medline Indus., Inc.*, 220 N.E.3d 380, 387 (Ill. App. Ct. 2022) (emphasis added).

Illinois courts assess the potential for coverage using the so-called "eight-corners" rule. See *Pekin Ins. Co. v. St. Paul Lutheran Church*, 78 N.E.3d 941, 951 (Ill. App. Ct. 2016). That approach requires us to compare "the four corners of the underlying complaint with the four corners of the insurance contract[s]" at issue—here, the policies LB Steel took out from

St. Paul, Travelers, and Charter Oak. *Id.* From there we ask whether the facts alleged in the complaint, "liberally construed in favor of" Walsh, fall at least potentially within the policies' coverage. *Outboard Marine Corp.*, 607 N.E.2d at 1220. This threshold is "low, and any doubt … [must] be resolved in [Walsh's] favor." *Pekin Ins. Co. v. AAA-1 Masonry & Tuckpointing, Inc.*, 81 N.E.3d 1040, 1045 (Ill. App. Ct. 2017).

As Illinois law's emphasis on possibility (as opposed to plausibility) suggests, these rules do not establish or amount to a pleading standard. Nowhere does Illinois law require that "the complaint allege or use language affirmatively bringing the claims within the scope of the policy" before a duty to defend will attach. *Int'l Ins. Co. v. Rollprint Packaging Prods., Inc.*, 728 N.E.2d 680, 688 (Ill. App. Ct. 2000); see also *Empire Indemnity Ins. Co. v. Chi. Province of Soc'y of Jesus*, 990 N.E.2d 845, 854 (Ill. App. Ct. 2013) (same). To the contrary, Illinois courts have rejected such an approach because it would hinge the existence of the duty to defend "on the draftsmanship skills or whims of the plaintiff in the underlying action." *Rollprint Packaging Prods.*, 728 N.E.2d at 688. Recognizing the inequity of such a rule, Illinois courts have made clear that the controlling inquiry is whether there is potential for coverage, not whether that potential is plausibly alleged or described with particularity in the underlying complaint. To confuse pleading rules with duty to defend obligations is to make a legal error.

Moving to the allegations of the City's complaint in its litigation with Walsh, a couple of key points stand out. The City alleged that Walsh breached its contractual obligations in many ways, including by "performing, or causing to be performed, inadequate welds" that did not conform to

industry standards or the FACE project's specifications. See R. 60-2, ¶¶ 208–09. And although the City's complaint did not specify whether or how these defects compromised the canopy structure, it sought damages for "investigation, loss of competitive advantage, removal, repair and/or replacement, additional costs of construction, diminution of value, and costs for consultants and attorneys." *Id.* at ¶ 218.

The majority is right to observe that LB Steel's defective welds could result in covered damages under the St. Paul, Travelers, and Charter Oak policies only if they in turn caused physical damage to other components of the canopy. To resolve that question, re-read the previous paragraph's quotation from the City's complaint and ask yourself whether the allegations preclude any possibility that LB Steel's welds caused such damage. The answer is no. Although the City's complaint explicitly alleged that Walsh (through its subcontractors) provided defective structural welds, it was silent on the *effect* that those defects had, or did not have, on the O'Hare Airport's broader canopy structure. That silence has a legal consequence under Illinois law given the inferences that otherwise flow from the City's complaint.

The City's complaint did not foreclose the possibility that the defective welds caused physical damage to other elements of the canopy. It is easy to imagine how structural welds in a massive, intricate structure like the O'Hare Airport's canopy could (and that is all that matters) cause elements supported by those welds to warp, buckle, or sag. That the complaint does not explicitly allege such damage is irrelevant, because Illinois law does not require "the complaint [to] allege or use language affirmatively bringing the claims within the scope of the policy." *Rollprint Packaging Prods.*, 728 N.E.2d at 688.

Nor is it relevant that we now know that such damage did not in fact occur. Under Illinois law, it is the complaint that controls, not hindsight. All of this leads me to conclude that the insurance companies did have a duty to defend Walsh.

In reaching a contrary conclusion, the majority applies a quasi-pleading requirement that finds little support in Illinois law. As it sees things, what is missing from the City's complaint is an explicit factual allegation that the defective structural welds damaged the canopy. The majority roots this requirement in both our decisions in *Lagestee-Mulder, Inc. v. Consolidated Ins. Co.*, 682 F.3d 1054 (7th Cir. 2012) and *Amerisure Mutual Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806 (7th Cir. 2010) and in a functional desire to avoid defining the duty to defend so broadly that it is triggered by any complaint that lodges a general and non-particularized request for damages. Although I understand the majority's concern, I am unable to agree with its application of those decisions here.

In *Lagestee-Mulder* and *Amerisure*, we applied what effectively amounts to an exception to the principle, repeated ad nauseum by Illinois courts, that an insurer can refuse to defend a suit "only if the allegations of the underlying complaint preclude any possibility of coverage." *Ill. Union Ins. Co.*, 220 N.E.3d at 387; see also, *e.g.*, *Fayezi v. Ill. Casualty Co.*, 58 N.E.3d 830, 846 (Ill. App. Ct. 2016); *Ill. Emcasco Ins. Co. v. Nw. Nat'l Casualty Co.*, 785 N.E.2d 905, 910 (Ill. App. Ct. 2003). The complaints there, much like the City's here, alleged defects in the insured's own work and lodged general requests for damages that did "not logically foreclose the theoretical possibility" that those defects inflicted damage to the property of others. *Amerisure*, 622 F.3d at 811–12; see also *Lagestee-Mulder*, 682 F.3d at 1058–59. Nonetheless, we held in

each case that the complaint did not trigger a duty to defend because the possibility of coverage in those cases was utterly speculative.

The majority seems to read *Lagestee-Mulder* and *Amerisure* to require factual allegations explicitly alleging covered damages before a duty to defend will be triggered. I do not read those cases so broadly. In my view, those decisions embody a narrower rule (or perhaps an exception to a broad rule) that applies only when the possibility of coverage can be ascertained only through rank speculation. This is not such a case.

One does not have to be a civil engineer to understand the risk that defective structural welds pose to the physical integrity of the structural elements they support. Indeed, that precise consideration jumps off the page of the City's complaint: the City cared about the welding defects precisely because those defects may have compromised the structural integrity of the canopy at the O'Hare Airport. Recognizing as much, an employee in Travelers' own legal department stated in an internal memorandum that "We think we might have a duty to defend Walsh." In light of that admission, the majority's conclusion that the City's complaint did not disclose *any* possibility of covered damages is difficult to accept.

To be clear, I would not—as the majority suggests—require that the City's complaint expressly disavow the existence of covered damages before finding the absence of a duty to defend. Such a view is incompatible with the requirement that an underlying complaint allege at least *some* facts that, liberally construed, fall "potentially within" a policy's coverage. See *Crum & Forster*, 620 N.E.2d at 393.

Where I disagree with the majority is in its insistence that a potential for coverage cannot be reasonably inferred from the facts that the City did allege in its complaint. Unlike the majority, I would not require an explicit allegation of covered damages when the potential for such damage is clear as a matter of common sense.

We should be careful before turning *Lagestee-Mulder* and *Amerisure*'s narrow holdings into the kind of pleading requirement the Illinois courts have continuously disavowed. I worry that the majority's opinion takes a step in that direction. Construing the allegations of the City's complaint liberally in Walsh's favor, as we are required to do, I would conclude that those allegations fall at least potentially within the coverage of the St. Paul, Travelers, and Charter Oak policies. I therefore respectfully dissent from the majority's holding that St. Paul, Travelers, and Charter Oak had no duty to defend.